**NOT FOR CITATION**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MEDICAL INSURANCE EXCHANGE OF
CALIFORNIA

        Plaintiff,

      v.

CERTAIN UNDERWRITERS AT
LLOYDS, LONDON, et al.,

        Defendants.
_____/

No. C 05-2609 PJH

**ORDER GRANTING MOTION TO
COMPEL ARBITRATION**

    Defendants' motion for an order compelling arbitration and staying the action

pending arbitration came on for hearing before this court on October 5, 2005. Plaintiff

appeared by its counsel David E. Weiss, and defendants appeared by their counsel Donald

W. Rees, Michael P. Thompson, and Kimberly M. Hamm. At the hearing, the court ordered

further briefing, which was completed on November 18, 2005. Having read the parties'

papers and carefully considered their arguments and the relevant legal authority, and good

cause appearing, the court hereby GRANTS the motion as follows.

**BACKGROUND**

    This is an insurance case alleging breach of contract, breach of the implied covenant

of good faith and fair dealing, and misrepresentation. Defendants seek an order compelling

arbitration of the plaintiff's claims.

Plaintiff Medical Insurance Exchange of California ("MIEC"), located in Oakland, California, is a doctor-owned insurance company that provides medical malpractice liability insurance to healthcare providers. MIEC purchases reinsurance in order to spread the risk of loss among other participants in the insurance industry.

Defendants ("the reinsurers") are six insurance companies – AXA Corporate Solutions Reinsurance Company, Axis Reinsurance Company, Odyssey America Reinsurance Company, Continental Casualty Company, Transatlantic Reinsurance Company, and Converium Limited – plus a group of English underwriting syndicates identified as Certain Underwriters at Lloyd's, London ("Lloyd's" – also referred to as the "lead reinsurer").[1]

At issue are two policies of reinsurance, the Primary Excess of Loss Reinsurance Agreement, covering the period February 1, 2002, to February 1, 2003 ("the 2002 Contract"), and the Primary Excess of Loss Reinsurance Agreement, covering the period February 1, 2003, to February 1, 2004 ("the 2004 Contract") (collectively, "the Policies"). Pursuant to the Policies, the reinsurers agreed to provide reinsurance to MIEC for losses paid by MIEC under various insurance policies issued by MIEC to health care providers, including individual physicians. The Policies provide "excess of loss" reinsurance, which requires the reinsurers to pay only after the losses exceed a certain amount (here, $75,000), referred to as a "retention." Amounts below the retention must be borne by MIEC, while the reinsurers pay amounts that exceed the retention.

Both of the Policies contain an arbitration provision, requiring that "all disputes or differences arising out of or connected with this contract" be referred to binding arbitration before arbitrators experienced in reinsurance matters. The arbitration provision in both Policies also contains an exception providing that if any matters in dispute involve "allegations of misrepresentation, non-disclosure, concealment, or fraud, then either party

---

[1] Shortly after the complaint was filed, one defendant – Hannover Ruckversicherungs A.G. – was dismissed from the case. On January 3, 2006, pursuant to stipulation, defendant Transatlantic Reinsurance Company was also dismissed.

shall have the right to litigate and shall not be compelled to arbitrate those or any other matters in dispute."

Beginning in 2002 and continuing into 2003, hundreds of claims were asserted against a group of cardiologists located in Redding, California. The cardiologists were insured by MIEC under individual policies of liability insurance. The claims involved allegations that the doctors had performed unnecessary procedures causing serious injuries to the claimants.

MIEC agreed to defend its insureds against these claims, and also provided immediate notice to the reinsurers. In July 2004, a tentative global settlement of 774 of the lawsuits was reached, and MIEC agreed to contribute $24 million to settle the claims against its insureds. MIEC and its insureds had until December 2004 to accept or reject the settlement.

MIEC claims that it provided the reinsurers with detailed information about the structure of the tentative settlement, including the fact that it called for a lump sum payment to settle all or substantially all of the underlying claims. According to MIEC, the reinsurers did not object to the settlement, gave no indication that the proposed settlement would adversely impact MIEC's reinsurance recovery, and did nothing to challenge MIEC's calculations. MIEC alleges that the reinsurers led MIEC to believe that the settlement would be covered under the Policies and that there was no reason for MIEC not to go forward with the settlement.[2]

The settlement became final in December 2004, and MIEC made the $24 million payment. MIEC then requested payment from the reinsurers under the Policies. In response, the reinsurers rejected the request, claiming that because the plaintiffs' "payment grid" had allocated the settlement amount among all the individual claimants, such that the individual allocations did not exceed $75,000 per claimant, there was no coverage under the Policies. MIEC asserts that had the reinsurers taken this position prior to the time the

---

[2] The reinsurers dispute MIEC's allegations.

3

1   settlement had become final, MIEC could have proceeded in a different manner in resolving

2   the underlying claims.

3       MIEC filed this action in the Superior Court of California, County of Alameda, on May

4   24, 2005, alleging breach of contract and breach of the implied covenant of good faith and

5   fair dealing.  On June 24, 2005, counsel for Lloyd's wrote demanding arbitration.  That

6   same day, counsel for MIEC wrote stating that MIEC rejected the demand for arbitration,

7   on the basis that the claims against the reinsurers involved allegations of

8   misrepresentation, concealment, non-disclosure, and fraud.

9       Defendants removed the case on June 27, 2005, alleging diversity jurisdiction, and

10  also asserting that the claim was subject to arbitration under Chapter 2 of the Federal

11  Arbitration Act, implementing the Convention on the Recognition and Enforcement of

12  Foreign Arbitral Awards, 9 U.S.C. §§ 201 et seq.

13      On July 5, 2005, defendants moved to stay the action and compel arbitration,

14  arguing that arbitration was required pursuant to the FAA and the arbitration agreement in

15  the policies.  Defendants asserted that the arbitration provision encompassed all MIEC's

16  claims, and that the exception for "allegations of misrepresentation, non-disclosure,

17  concealment, or fraud" did not apply to a dispute about the parties' performance under the

18  contracts.

19      On July 11, 2005, MIEC filed a first amended complaint (FAC), adding a cause of

20  action for misrepresentation and concealment.  In the FAC, MIEC alleges that defendants

21  breached the reinsurance contracts by rejecting MIEC's valid claim for coverage for the

22  underlying losses and by demanding arbitration; that defendants breached the implied

23  covenant of good faith and fair dealing by failing to advise MIEC that the settlement of the

24  underlying losses would not be covered, and by compelling MIEC to institute and prosecute

25  this action to obtain coverage under the Policies; and that defendants concealed material

26  information, leading MIEC to believe that the global settlement would be covered under the

27  Policies.

28      Defendants then renewed the motion to compel arbitration.

4

**DISCUSSION**

A.    Legal Standard

Under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, et seq., any party bound to an arbitration agreement that falls within the scope of the FAA may bring a motion in federal district court to compel arbitration and stay the proceeding pending resolution of the arbitration.  9 U.S.C. §§ 3, 4.  The FAA eliminates district court discretion and requires the court to compel arbitration of issues covered by the arbitration agreement.  <u>Dean Witter Reynolds, Inc., v. Byrd</u>, 470 U.S. 213, 218 (1985).  The FAA limits the district court's role to determining whether a valid agreement to arbitrate exists, and whether the agreement encompasses the dispute at issue.  <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1130 (9th Cir. 2000).

B.    Defendants' Motion to Compel Arbitration

Defendants seek an order compelling arbitration, based on the arbitration provision in the 2002 and 2003 Contracts.  In its original opposition to the motion, MIEC argued that because arbitration is a matter of contract, parties cannot be forced to arbitrate matters that they have not agreed to arbitrate.  MIEC asserted that defendants cannot compel it to arbitrate the dispute because the issues that form the subject matter of the arbitration involve allegations of misrepresentation, and it therefore has the right under the arbitration provision to litigate its claims.

In response, defendants asserted that the 2002 and 2003 Contracts are "successors to a long line of previous contracts" by which MIEC insured its business.  They claimed that it was the intent of the parties, starting in 1993, that the language of the exception apply narrowly – to disputes regarding the formation or validity of the contract only – and not to any dispute that might be asserted under the label of "misrepresentation" or "fraud."

Defendants argued that despite what appears to be the plain language of the arbitration exception, the parties intended to exclude only a narrow category of potential claims.  They asserted that the extrinsic evidence shows that the exception is ambiguous, and should be interpreted to apply only to a claim for rescission of the contract, because

that is what the parties intended.  They argued that where parties have agreed to arbitrate, and the agreement is ambiguous, it should be interpreted in favor of compelling arbitration.

At the October 5, 2005, hearing on defendants' motion, the parties disputed the effect of a change in the 1994 Contract.  While the evidence was clear with regard to the 1993 Contract – the arbitration provision included an exception that applied only to disputes regarding the validity or formation of the contract –  the only evidence submitted which appeared to show any connection between the 1993 exception and the revised agreement for 1994 was presented with defendants' reply papers.

The court ordered further briefing, and submission of any additional evidence, on the question of the parties' intent when the change to the arbitration provision was effected. The court also indicated that the parties could conduct limited discovery if necessary to allow MIEC the opportunity to provide evidence countering the evidence provided by the defendant reinsurers regarding the 1994 change.

1.      The evidence

The parties have submitted copies of correspondence and other documents produced by defendants, along with various declarations.  No party has objected to the admissibility or authenticity of any of this documentary evidence.  In addition, the parties have submitted a number of declarations.

The evidence shows that the 1992 Primary Excess of Loss Reinsurance Agreement ("the 1992 Contract") included an arbitration provision, though it had no exception.  In 1993, a lawyer for lead underwriter Trevor Clegg of the J.H. Mumford Syndicate drafted an arbitration provision as follows:  "As a condition precedent to any right of action hereunder, all disputes or differences arising out of or connected with this Contract . . . except as to its formation or validity but including interpretation or implementation of its terms, shall be referred to arbitration."

In mid-May 1993, after MIEC had approved and signed 1993 Primary Excess of Loss Reinsurance Agreement ("the 1993 Contract") containing this arbitration provision, Carvill America sent the contract to the reinsurers for their signatures and approvals.

6

Carvill America was the U.S. broker that placed MIEC's reinsurance contracts with U.S.-based reinsurers over the years, and had been designated by the parties to the reinsurance contracts as "the intermediary negotiating this Contract for all business hereunder."

Continental Casualty Company ("CNA"), one of the domestic reinsurers, questioned the wording of the arbitration provision and expressed its concerns to Carvill America. CNA's questions were set forth in a letter dated June 4, 1993, from Robin Geberth ("Geberth") of CNA[3] to Andrew Firth ("Firth") of Carvill America.[4]  With respect to the arbitration provision, CNA asked, "In the first paragraph, if the dispute involves 'formation or validity' but excludes interpretation or implementation, is the method of resolution litigation?"

Carvill America (Firth) responded in a memorandum dated July 2, 1993, stating that the arbitration clause in the 1993 Contract had been "developed by the London market through the course of extensive discussions between the Barrett Syndicate, the Mumford Syndicate, and CNA International, among others."  The memo also stated that the general intent regarding the 1993 arbitration provision was that all disputes should be arbitrated, unless a dispute involved a question as to whether the contract was "actually valid."  In his declaration, Firth asserts that MIEC was not involved in any of those "extensive discussions," and was not even informed that they were going on.

Ron Neupauer ("Neupauer") concurs with Firth's opinion.[5]  Neupauer states in his declaration that the only explanation MIEC ever received about the wording of the 1993 arbitration clause was in a memo it received when it was presented with the 1993 Contract. That memo stated only that the arbitration provision "has been significantly amended in line

---

[3]  Geberth was a Contract Consultant in the Reinsurance Division of Continental Casualty Company in 1993-1994, and was the Contract Consultant involved with the 1993 and 1994 Contracts.

[4]  Firth was a Vice President at Carvill America in 1993-1994, and is presently employed by Medical Underwriters of California ("MUC"), the management company for MIEC.

[5]  Neupauer was Vice President of Underwriting for MIEC in 1993-1994, responsible for MIEC's placement of reinsurance, and is presently employed as President of MUC.

with evolutionary thinking in the London market."

A July 9, 1993, memorandum from John Haydon ("Haydon") at R.K. Carvill & Co. Ltd. ("R.K. Carvill" – which is affiliated with Carvill America) to Firth at Carvill America identifies an additional issue raised by CNA – the concern that with respect to a "formation/validity" dispute, the only recourse would be litigation even if both sides agreed to arbitrate. R.K. Carvill stated,

> As previously advised, the intention is to enable the reinsurer to take legal steps to challenge the treaty on the grounds of, for example, material/fraudulent misrepresentation and/or non disclosure and/or non payment of premium, etc. i.e. matters which make the validity of the contract questionable. However, do not agree with the assertion that the <u>only</u> recourse open to either party in such a dispute is litigation. The clause provides an "opt out" from the arbitration provisions that would otherwise automatically apply. Having revised the language, and discussed with Trevor Clegg, can advise that the intention is <u>not to preclude arbitration</u> as a means of resolving disputes as to formation or validity, but rather to <u>reserve the option</u> of litigation. Thus, if both parties agree, there is absolutely no reason why even in formation/validity matters both Reassured and Reinsurer should not attempt to resolve the dispute through arbitration. As I interpret the language, all disputes <u>must</u> be referred to arbitration, other than formation/validity disputes which <u>may</u> be so referred.

Firth forwarded the July 9, 1993, R.K. Carvill memorandum to CNA (Geberth) with another memorandum dated July 12, 1993, stating, "Please find attached a copy of a fax from our London office advising some of the background on the drafting of the Arbitration Article presented to you" in the 1993 contract documentation." A hand-written note on that July 12th memo states, "The clause in the contracts does not seem to state arbitration is an option for what is excepted in the 1st paragraph – which is the whole issue."

Shortly thereafter, on July 22, 1993, CNA (Geberth) wrote back to Carvill America (Firth) to advise that CNA had two concerns – (1) the phrase "except as to its formation or validity" was too broad and went beyond Trevor Clegg's intent of "not subjecting a fraudulently placed reinsurance contract to arbitration when the entire contract is in question;" and (2) the arbitration clause also seemed to make litigation mandatory for the excepted claims. Geberth indicated that after discussions with its law department, CNA could not accept the revised wording, because it believed it precluded arbitration of disputes regarding validity, even if the parties agreed to arbitrate. CNA requested that the

8

arbitration provision be revised to require that all disputes be arbitrated, as follows: "As a condition precedent to any right of action hereunder, all disputes or differences arising out of or connected with this Contract shall be referred to arbitration . . . ."

Ultimately, on August 3, 1993, CNA (Geberth) wrote to Carvill America (Firth) to say that CNA had executed the 1993 Contract with the revised arbitration wording, subject to the proviso that "[o]ur signing of these documents is in no way to set, or presume, a precedent as respects our wording of the arbitration clause;" and "[s]aid Arbitration Clause is to be modified, as discussed in my fax of 22nd July, 1993, to you, for the 1994 renewal of their contracts." In addition, "[a]s we discussed, [CNA Vice President] Bill Adamson will speak to Trevor Clegg at a later date regarding this issue."

According to Firth, MIEC had already signed off on the 1993 Contract before any of the above-described discussions among CNA, Carvill America, and the London reinsurers too place.

The arbitration provision was rewritten in for the 1994 Primary Excess of Loss Reinsurance Agreement ("the 1994 Contract"). The new clause was drafted by Trevor Clegg, and approved by his counsel, Mendes & Mount. Carvill America (Firth) forwarded the new arbitration provision to CNA (Doug Behnke ("Behnke"), and sent a copy to Geberth, by memorandum dated December 3, 1993, stating as follows: "Following the recent discussions that took place on the 1993 Contract Documentation, we wanted to provide CNA with the opportunity to review the Arbitration Article proposed for the 1994 placement."

The first paragraph of Article 25 ("Arbitration") contained CNA's requested language, requiring that all disputes be arbitrated. The second paragraph contained an exception reading as follows: "In the event that any of the issues which form the subject matter of the arbitration involve allegations of misrepresentation, non-disclosure, concealment or fraud, then either party shall have the right to litigate and shall not be compelled to arbitrate those or any other matters in dispute."

On December 7, 1993, Geberth wrote Behnke as follows:

9

As noted in Andy Firth's fax of December 3, 1993, to you, regarding the above referenced [draft arbitration clause], I have received a copy of same. As you might recall, there was much discussion over the arbitration wording used in the 1993 Contracts for this client.

I have reviewed the wording that Carvill is proposing for 1994. The biggest obstacle remains the second paragraph, which gives the option of by passing arbitration and going straight to litigation for all allegations of misrepresentation, non-disclosure, concealment or fraud. Before this is approved, I would discuss this with Bill Adamson and Tim Madden. The problem is that if we agree to this wording, for this particular client, we may unwittingly be setting a precedent for all placements through Carvill London.

Also, please note the wording of the fifth paragraph, which states in the last sentence that the arbitration proceedings will not be governed by the commercial rules of the American Arbitration Association. The problem is that the clause never states what the governing rules will be. I do not remember if there is a Governing Law Clause in these Contracts. If so, this will solve the problem. If not, the issue remains open.

When possible, please let me know what Underwritings position on this is.

After internal discussion, CNA (Behnke) responded to Carvill (Firth) by letter dated January 13, 1994:

I have met with Bill Adamson and reviewed the proposed Arbitration Clause. Our feelings are that the fifth paragraph of this clause must reference an acceptable governing body such as the American Arbitration Association, or state that the arbitrators may establish their own rules for use in these proceedings.

The use of this Arbitration Clause is strictly limited for the contracts issued to MIEC only, and our agreement of same is in no way to be interpreted as blanket approval of this Clause for use in any other placement in which Continental Casualty is involved.

On January 21, 1994, R.K. Carvill (Haydon) wrote Carvill America (Firth) noting receipt of CNA's letter of January 13, 1994, stating that CNA's agreement to the arbitration clause was strictly limited to MIEC only, and providing further information from Trevor Clegg regarding the fifth paragraph discussed in CNA's prior correspondence. .

On January 24, 1994, Carvill America (Firth) confirmed that the clause would be limited to MIEC. A notation dated January 25, 1994, indicates that CNA agreed to the language in the 1994 Contract.

Memos "To File" prepared by R.K. Carvill (Haydon) and Carvill America (Firth), dated January 19, 1994, and March 1, 1994, respectively, state that the arbitration

provision "has been amended" by Trevor Clegg.  The Firth memo states, in part,

> The Primary layer wording for 1994 is based on the expired wording which was originally effective February 1, 1992, and was subsequently amended in Addendum No. 1 with effect from February 1, 1993.  The changes for 1994 reflect the same changes in the slip and are as follows . . .
>
> Article 25 – Arbitration
>
> This section has been amended by the Leader [Trevor Clegg] – most of the changes are editorial, however the following are noted for your information:
>
> *Paragraph 1* – the exception which provided for litigation in the event of differences of formation or validity has been clarified as "allegations of misrepresentation, non-disclosure . . . " and placed in a new 2nd paragraph.

On March 16, 1994, CNA (Geberth) wrote Carvill America (Firth), enclosing CNA's signatures on the 1994 contracts, and stating as follows with regard to the language of the arbitration provision:

> As we have previously discussed, the 1994 Contract includes an Arbitration Clause with wording mandated by the [lead underwriter].  Please note that in our signing of the 1994 Contract, this should in no way be interpreted as setting a precedent of our blanket approval of this wording, nor as our agreement to use this wording in any placement other than for MIEC.

According to Neupauer, MIEC was not involved in drafting the language in the 1994 Contract, nor was MIEC privy to any of the discussions regarding its drafting.  MIEC received only a copy of the contract and the January 19, 1994, memo.

2.      The parties' arguments

In the moving papers, defendants argue that the exception in the arbitration provision was not designed to turn any dispute about the parties' performance under provisions of the contracts into a matter for litigation.  They claim rather that the exception was designed to cover a specific scenario that arises frequently in the reinsurance industry – a claim brought by a reinsurer for rescission of an insurance contract, a claim in which the principal grounds are misrepresentation, non-disclosure, concealment, or fraud.

Defendants assert that the form of exception that appears in the 2002 and 2003 Contracts was first included in the reinsurance contract in 1993, at the request of Trevor Clegg, the lead underwriter in the London market reinsurers at the time.  Defendants note that Carvill America wrote a letter to CNA on July 2, 1993, stating that "[t]he general

11

intention is that all disputes should be referred to arbitration, unless the dispute involves the question as to whether the contract is actually valid, e.g., in terms of gross misrepresentation at or before inception."

Defendants note further that CNA confirmed with Carvill America on July 22, 1993, that Trevor Clegg's intent in adding the exception was "not subjecting a fraudulently placed reinsurance contract to arbitration when the entire contract is in question," and that Haydon of R.K. Carvill advised Firth on July 9, 1993, that the intent was "not to preclude arbitration as a means of resolving disputes as to formation or validity, but rather to reserve the option of litigation."

Defendants argue that the present dispute does not involve any contract "formation/validity" matters, nor any claim for rescission by any party to either contract, and that the exception therefore does not apply.

MIEC opposes the motion, arguing that nothing in the arbitration provision limits the exception to claims brought by a reinsurer, and that there is nothing to suggest that it applies only to claims for rescission. MIEC concedes that the language in the 1993 Contract simply amended a policy that previously had no exceptions, and provided an exception for disputes as to the formation or validity of the contract.

MIEC notes, however, that the exception in the 2002 and 2003 Contracts by its terms applies "[i]n the event that any of the issues which form the subject matter of the arbitration involve allegations of misrepresentation, non-disclosure, concealment, or fraud." MIEC argues that this means that any claims alleging misrepresentation, non-disclosure, concealment, or fraud, are exempted from mandatory arbitration, and that because this case involves a dispute that contains allegations of fraud and concealment, it plainly falls within the exception.

In reply, defendants reiterate that the exception in the 1993 Contract was intended to cover a specific scenario, and was not intended to apply in a case such as the present. Defendants contend that the exception in the 1994 Contract – which appears verbatim in the 2002 and 2003 Contracts – reflects the same intent as the 1993 exception and was

1   intended merely as a clarification.

2        Defendants contend that the FAA and the Convention require that the court give

3   effect to the arbitration provision, and argue that whenever there is any doubt about

4   arbitrability, that doubt should be resolved in favor of arbitration.  They also assert that

5   whether a claim falls within the scope of an arbitration agreement is determined by focusing

6   on the factual allegations of the complaint rather than the legal causes of action.

7   Defendants claim that although MIEC "alleges" fraud, the real dispute here is over

8   defendants' failure to pay under the policies – in other words, a simple contract dispute.

9   They argue that MIEC has inserted the allegations of misrepresentation and concealment

10  in an effort to get around the arbitration requirement.

11       Defendants submit that under California law, the court must examine the extrinsic

12  evidence in order to ascertain the parties' intent in agreeing to the arbitration provision.

13  They contend that the evidence shows that the 1994 provision, which survives in the 2002

14  and 2003 Contracts that are the subject of this action, was changed from its 1993 iteration

15  and was intended to serve the same purpose ("not subjecting a fraudulently placed

16  reinsurance contract to arbitration when the entire contract is in question").  They maintain

17  that Carvill America, as the insurance broker who placed MIEC's reinsurance contracts with

18  U.S.-based insurers, and R.K. Carvill & Co., the broker who placed MIEC's reinsurance

19  contracts with the London and European insurers over the years, were the agents of MIEC

20  (the reinsured), not the agents of the reinsurers, and that the knowledge and statements of

21  Carvill America and R.K. Carvill & Co. are binding on MIEC.

22       In its supplemental brief, MIEC again asserts that the language in the exclusion is

23  not limited to a claim for rescission or any other claim related to the formation of the

24  reinsurance contracts, noting that the words "rescission" and "formation" do not appear in

25  the provision, and noting also that the exception applies to "any of the issues" in dispute, so

26  long as they involve allegations of misrepresentation.

27       MIEC contends that the language in the exclusion is not ambiguous, as it is not

28  subject to more than one interpretation, and that the additional documents provided by

defendants since the October 5, 2005, hearing further underscore that there is no ambiguity. Based on the newly produced December 7, 1993, internal CNA memorandum (from Geberth to Behnke) CNA maintains that the reinsurers understood the 1994 provision excluded all fraud-related allegations – not just those arising in a rescission case. In that memorandum, Geberth states that "[t]he biggest obstacle remains the second paragraph, which gives the option of by passing arbitration and going straight to litigation for allegations of misrepresentation, non-disclosure, concealment or fraud." MIEC claims that this shows that the reinsurers knew that the language in the proposed 1994 provision was broader than the previous wording, which contained an exception for claims relating to "formation/validity."

MIEC also contends that the March 1, 1994 memorandum "to File" from Carvill America (Firth) – stating that "the exception which provided for litigation in the event of differences of formation or validity has been clarified as 'allegations of misrepresentation, non-disclosure . . . ' and placed in a new 2nd paragraph" – related to CNA's concern, not with the scope of the exception, but with regard to whether the parties would be required to litigate claims that fell within the exception even if they all wanted to arbitrate. MIEC asserts that a newly-produced copy of the July 12, 1993 memorandum from R.K. Carvill (Haydon) to CNA (Geberth) contains a note from Geberth which describes this as "the whole issue," and that the Carvill America memo therefore does not support defendants' argument.

MIEC argues that the extrinsic evidence establishes that the reinsurers understood that the 1994 language excluded all fraud claims from mandatory arbitration, not just rescission claims. Based on the evidence, MIEC claims that a) in 1992 there was a broad arbitration provision with no exception; b) in 1993 the lead underwriter in London wanted an exception for claims based on "formation/validity;" c) a contract containing that language, drafted by the lead underwriter, was subsequently sent to MIEC for approval; d) after MIEC signed the contract, it was sent to the other reinsurers for their signatures; e) CNA, which wanted everything to be arbitrated without exception, objected that the

exception was too broad; f) a series of correspondence was exchanged between CNA and Carvill America (which relayed the position of R.K. Carvill and the underwriters), none of which was shared with MIEC; g) CNA finally advised Carvill America in August 1993 that it would sign the 1993 Contract, but that the arbitration provision needed to be modified for 1994, and that CNA's Vice-President Bill Adamson would speak to Trevor Clegg in London; h) the 1994 arbitration provision, drafted by Trevor Clegg, was considerably different than the 1993 provision, as it contained an exception permitting litigation of any issue involving misrepresentation, and stated that other issues in dispute could also be litigated; and i) the inclusion of this language was deliberate, as shown by the fact that CNA commented in its December 7, 1993, internal memorandum that "[t]he biggest obstacle remains the second paragraph, which gives the option of by passing arbitration and going straight to litigation for allegations of misrepresentation, non-disclosure, concealment or fraud."

    MIEC contends that the fact that MIEC, Carvill, and the reinsurers agreed to the language in the 1994 provision, which remained in the succeeding contracts for almost 10 years, and the fact that CNA was careful to make clear that this language could be used only in the MIEC contracts, demonstrates that the parties understood that the language applied to more than just rescission claims. MIEC also argues that if the parties intended that only rescission-type disputes could be litigated, they would not have inserted language saying that "those or any other matters in dispute" could be litigated. MIEC claims that they would have allowed litigation of only the rescission matters, and would have required arbitration of the remaining issues if the rescission claim was rejected.

    MIEC contends that the only evidence regarding the 1994 provision that the reinsurers can point to in support of their position is the vague statement by Carvill America in the March 1, 1994, memorandum that the arbitration provision had been "clarified." MIEC argues that this statement is not sufficient to change the plain meaning of the contract. MIEC asserts that as CNA's primary concern seemed to be its view that the 1993 provision mandated litigation of certain claims even if the parties wanted to arbitrate, it is more likely that this is the "clarification" referred to in the Carvill memorandum.

1    Finally, the above arguments notwithstanding, MIEC argues that the extrinsic

2    evidence is not relevant or admissible because it is not being offered to explain the

3    meaning of the contracts, but to contradict their plain meaning.  MIEC notes that in <u>Pacific</u>

4    <u>Gas & Electric Co.</u>, the California Supreme Court made clear that extrinsic evidence can be

5    examined in order to determine whether contract language, seemingly clear on its face, is

6    reasonably susceptible to a certain meaning.  MIEC asserts, however, that extrinsic

7    evidence is not admissible to contradict express terms in a written contract or to explain

8    what the agreement was.

9        MIEC argues that the reinsurers are not trying to explain an ambiguity, or explain

10   that the language in the contract is susceptible to more than one meaning – but rather are

11   offering extrinsic evidence in an attempt to contradict plain language.  MIEC notes that the

12   contract says that if "any of the issues" in dispute involve allegations of fraud, then the

13   matter can be litigated, and argues that the defendants are asserting that the only issue

14   that can be litigated is a rescission claim.

15       MIEC contends that the extrinsic evidence is irrelevant for an additional reason,

16   arguing that, at most, it demonstrates the reinsurers' "undisclosed intent," not the parties'

17   mutual intent.  MIEC claims that there was no way that it could have understood that the

18   1994 language was limited to rescission-type claims, because it was not privy to any of the

19   1993 discussions that defendants claim led to the changes in the 1994 provision.

20       MIEC notes that the reinsurers have suggested that Carvill America was the

21   "functional equivalent" of an insurance broker – as the reinsurance contracts state that

22   Carvill America is the "intermediary negotiating this contract for all business thereunder" –

23   and that Carvill America's knowledge and statements" are therefore binding on MIEC.

24   MIEC argues, however, that under California law, the actual relationship between the

25   broker and the insured, is determined by what the parties do and say, not by the name they

26   are called.  MIEC asserts that in the present case, it is clear that Carvill America was acting

27   for <u>the reinsurers</u> to facilitate their discussions and negotiations.

28       In their supplemental brief in response to MIEC's arguments, the defendant

reinsurers reiterate that this case involves a coverage dispute, not a rescission dispute, and they contend that the plain language of the arbitration provision requires arbitration of all disputes arising under the contract. They assert that MIEC has not provided facts or evidence sufficient to overcome the presumption in favor of arbitration under the FAA. They also argue that MIEC's argument ignores the plain language of the first paragraph of the arbitration provision – that "all disputes or differences arising out of or connected with this Contract . . . shall be referred to binding arbitration." They claim that if MIEC's arguments were accepted, the first paragraph would be meaningless, and assert that the second paragraph is a limited exception, not "a free pass for a plaintiff to plead its way out of the arbitration agreement" through allegations of misrepresentation or fraud.

Defendants assert further that the extrinsic evidence must be examined to determine the parties' intent, disputing MIEC's argument that the extrinsic evidence is not admissible or relevant because it is not being offered to explain the meaning of the contracts. They contend that under California law, the court may not interpret any contract without first considering extrinsic parol evidence of the parties' contractual intent, even if the language of the contract is unambiguous.

Defendants contend that the evidence is clear that the exception in the arbitration clause does not apply in the present case, and that the arbitration agreements encompass all of MIEC's claims. They contend that MIEC has produced no direct evidence regarding its own interpretation of the arbitration clause, but rather attempts to make its case through a distortion of defendants' evidence, by taking isolated sentences out of context.

For example, the defendants assert that the December 7, 1993, CNA memorandum (from Behnke to Firth), which states that "[t]he biggest obstacle remains the second paragraph, which gives the option of by passing arbitration and going straight to litigation for allegations of misrepresentation, non-disclosure, concealment or fraud" does not, as MIEC asserts, indicate that the parties intended to exclude all fraud-related claims from mandatory arbitration. Rather, defendants claim, this document, which must be viewed in the context of the ongoing discussion of rescission and formation/validity claims, does

nothing to support MIEC's position but actually provides further evidence of the parties' intent.

Defendants also argue that MIEC misconstrues the meaning of the handwritten note on the July 12, 1993, memorandum from Firth to Geberth, which states that "the Clause in the Contracts does not seem to state arbitration is an option for what is excepted in the first paragraph – which is the whole issue."  Defendants contend that, in context, the note addresses only one aspect of CNA's concern.  They also point out that notes from Andrew Firth, also from July 12, 1993, state that "Robin [Geberth] called and continued to voice concern that the <u>intent</u> of the language did not match with her interpretation of the written word."

According to defendants, the revised 1994 arbitration provision attempted to deal with both of those concerns – by narrowing the scope of the exception from "formation or validity" to "allegations of misrepresentation, non-disclosure, concealment, or fraud" at or before the inception of the contract; and by clarifying that, by agreement, the parties could arbitrate even rescission claims.

Based on the evidence, defendants claim that a) the genesis of the exception for "misrepresentation, non-disclosure, concealment or fraud" dates to 1993, when it arose at the request of the lead underwriter for the London market reinsurers at the time; b) as shown by the July 22, 1993, memo, CNA understood that the purpose of the 1993 exception (the intent of the London underwriter) was "not subjecting a fraudulently placed reinsurance contract to arbitration when the entire contract is in question;" c) as shown by the July 2, 1993, memo, Carvill America understood that the general intention of the 1993 exception was that "all disputes should be referred to arbitration, unless the dispute involves the question as to whether the contract is actually valid, e.g., in terms of gross misrepresentation at or before inception;" d) as shown by the July 9, 1993, memo, R.K. Carvill understood that Trevor Clegg's intention in devising the 1993 exception was "to enable the reinsurer to take legal steps to challenge the treaty on the grounds of, for example, material/fraudulent misrepresentation and/or non disclosure and/or non payment

of premium, etc., i.e., matters which make the validity of the contract questionable" and "not to preclude arbitration as a means of resolving disputes as to formation or validity, but rather to preserve the option of litigation. . . ." and that as Haydon interpreted the language, "all disputes must be referred to arbitration, other than formation/validity disputes which may be so referred;" e) as shown by Geberth's declaration and the July 22, 1993 memo, CNA was particularly concerned that the phrase "except as to formation or validity" was too broad and went beyond the intent of the exception; f) as shown by the August 3, 1993, letter, CNA signed the 1993 Contract with the understanding that the language of the provision would be modified in the 1994 Contract, and the language of the exception was accordingly changed to the language that appears in the contracts at issue in this case; g) as shown by the March 1, 1994, memorandum to File, the exception in the 1993 provision that provided for litigation in the event of differences of formation or validity was "clarified" as "allegations of misrepresentation, non-disclosure . . . " and placed in a new second paragraph; and h) the language regarding the exception having been "clarified as 'allegations of misrepresentation, non-disclosure . . . '" was taken verbatim from a memorandum prepared in London by John Haydon of Carvill London.

Defendants argue that there is no doubt that the exception contained in the 1994 Contract was intended merely as a "clarification," and that the purpose and intent of the exception in the 1993 Contract and in the 1994 Contract are the same – to exclude from arbitration claims for rescission and other issues that involve the formation or validity of the contract.

Finally, in response to MIEC's argument that it was not involved in the drafting of the contract language, defendants assert that the "intermediaries" – Carvill America and Carvill London – are agents of MIEC, and that their knowledge and intent can be attributed to MIEC. The reinsurers assert that Carvill's agenda, as the agent of MIEC, was to negotiate with the reinsurers to get the contracts approved and signed. They contend that if MIEC was not aware of the discussions among the reinsurers and between Carvill and the reinsurers regarding the wording of the arbitration clause, that is something MIEC should

take up with Carvill.

3. Analysis

The court finds that the motion to compel arbitration must be GRANTED. Having reviewed all the evidence, including the declarations, the internal Carvill correspondence, and the correspondence between Carvill and CNA, the court finds that the lead underwriter intended, and Carvill and the reinsurers understood that the lead underwriter intended, that the exception to the arbitration requirement be applied only where the validity or formation of the contract is being challenged.

A reinsurance contract is a type of insurance agreement under which one insurer agrees to indemnify another insurer against loss or liability that the second insurer may incur under policies of insurance that it has issued. See Cal. Ins. Code § 620; 2 Witkin, Summary of California Law, 10th ed. (2005), Insurance § 88. Reinsurance agreements almost universally contain arbitration clauses, stipulating that any disputes between the parties regarding the reinsurance contract will be submitted for nonjudicial resolution. Calif. Ins. Law & Practice (Matthew Bender & Co., Inc., 2005) § 11.01[1][b]. For this reason, there is little case authority that specifically addresses reinsurance disputes. Id.

The interpretation of reinsurance agreements is governed by the basic rules of construction applicable to all written contracts. California courts have treated reinsurance contracts as insurance contracts, and insurance contracts have been interpreted according to common principles applicable to contracts generally. See, e.g., Union Ins. Co. v. Am. Fire Ins. Co., 107 Cal. 327, 330-34 (1895).

The goal of contract interpretation is to give effect to the mutual intent of the parties at the time of contracting. See Cal. Civ. Code § 1636; see also Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., 109 Cal. App. 4th 944, 955 (2003) (citing Bank of the West v. Superior Court, 2 Cal. 4th 1254, 1264 (1992)). In interpreting contracts, the primary search is for a common meaning of the parties; the object of interpretation in the general law of contracts is to carry out the understanding of the parties rather than to impose obligations on them contrary to their understanding. Rest.

2d, Contracts, comment c; see also 1 Witkin, Summary, Contracts § 741.

The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties. Cal. Civ. Code §§ 1635-1656; Cal. Civ. P. Code §§ 1859-1861, 1864; Hernandez v. Badger Constr. Equip. Co., 28 Cal. App. 4th 1791, 1814 (1994).

Under traditional contract principles, extrinsic evidence is inadmissible to interpret, vary, or add to the terms of an unambiguous integrated written contract instrument. See, e.g., 4. S. Williston, A Treatise on the Law of Contracts § 631; see also E. Allen Farnsworth, Contracts, § 7.3 (quoting Williston: "It is generally held that the contract must appear on its face to be incomplete in order to permit parol evidence of additional terms.").

In California, the parol evidence rule is codified at California Civil Code § 1625 and California Code of Civil Procedure § 1856. See Marani v. Jackson, 183 Cal. App. 3d 695, 701 (1986). While the rule "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument," Alling v. Universal Mfg. Corp., 5 Cal. App. 4th 1412, 1433 (1992), it does not prohibit the introduction of extrinsic evidence "to explain the meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonably susceptible." BMW of North America, Inc. v. New Motor Vehicle Bd., 162 Cal. App. 3d 980, 990 n.4 (1984).

In Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33 (1968), the California Supreme Court explained that

> [t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.

Id. at 37. Where the meaning of the words used in a contract is disputed, the trial court

must provisionally receive any proffered extrinsic evidence that is relevant to show whether the contract is reasonably susceptible of a particular meaning. Id. at 39-40. Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible. Id. at 40 & fn. 8.

In Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564 (9th Cir. 1988), the Ninth Circuit (which disapproved of this trend in California law) observed that

> California does not follow the traditional rule. . . . Under Pacific Gas, it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement provides for another, the court must consider extrinsic evidence of possible ambiguity."

Id. at 568-69.

Two years later, in Wilson Arlington Co. v. Prudential Ins. Co. of No. America, 912 F.2d 366 (9th Cir. 1990), the Ninth Circuit elaborated:

> There was a time, not all that long ago, when parties to a commercial transaction could rely on a simple maxim – a clear contractual term means what it says. Based on the notion that words can be used to convey a clear meaning, this principle formed the underpinnings of the parol evidence rule that made extrinsic evidence inadmissible to interpret, vary or add to the terms of an unambiguous written instrument. . . .
>
> Notwithstanding the importance of its function, the parol evidence rule has been severely eroded in many jurisdictions during the past few decades. Often, this erosion has been so complete as to render the parol evidence rule essentially meaningless in ensuring the binding power of the written word. For example, in Pacific Gas & Electric the California Supreme Court, without expressly abolishing the parol evidence rule, cut the life out of it by permitting the introduction of extrinsic evidence to demonstrate the existence of an ambiguity even when the language of a contract is perfectly clear.

Id. at 369-70 (citations omitted). While California courts do not necessarily concur with the Ninth Circuit characterization, see, e.g., Banco Do Brasil, S.A. v. Latian, Inc., 234 Cal. App. 3d 973, 1011 n.53 (1991), it is nonetheless true that the parol evidence rule as applied in California permits the admission of extrinsic evidence to resolve any ambiguity.

On its face, the arbitration provision at issue in the present case is not, strictly speaking, ambiguous. However, under California law, an insurance policy provision is

considered ambiguous when it is capable of two or more constructions, both of which are

reasonable.  See Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., 5 Cal. 4th

854, 867 (1993).  The uncertainty may relate to the extent or existence of coverage, the

peril insured against, the amount of liability or the party or parties protected.  California

courts have ruled that extrinsic evidence is admissible to explain even "latent" ambiguities –

where the writing is clear on its face and becomes ambiguous only in operation.  See, e.g.,

Pacific Gas & Elec., 69 Cal. 2d at 40; see also W.E. Heller Western, Inc. v. Tecrim Corp.,

196 Cal. App. 3d 149, 158 (1987).

> Pacific Gas & Electric is . . . not a cloak under which a party can smuggle
> extrinsic evidence to add a term to an integrated contract, in defeat of the
> parol evidence rule.  Instead, it calls for a two-step process.  First, the court
> must determine whether the language of the contract is reasonably
> susceptible to the meanings urged by the parties.  In so doing, the court must
> give consideration to any evidence offered to show that the parties'
> understanding of words used differed from the common understanding.  If the
> court determines that the contract is reasonably susceptible of the meanings
> urged, extrinsic evidence relevant to prove the meaning agreed to by the
> parties is admissible.

Bionghi v. Metropolitan Water Dist. of So. Cal., 70 Cal. App. 4th 1358, 1365 (1999).

MIEC contends that under Pacific Gas & Electric, the court may look at extrinsic

evidence only if the language of the contract is not clear on its face, and argues that in the

present case, the court should not consider the extrinsic evidence because the arbitration

provision in the 2002 and 2003 Contracts clearly states that either party shall have the right

to litigate if "any of the issues which form the subject matter of the arbitration" involve

allegations of misrepresentation or non-disclosure.

It is true that the rule of Pacific Gas & Electric must be "restricted to its stated

bounds" – that is, it can be applied only to allow evidence of the parties' understanding and

intended meaning of the words used in their written agreement.  Brawthen v. H & R Block,

Inc., 28 Cal. App. 3d 131, 136 (1972).  Nevertheless, as explained above, the test of

admissibility of extrinsic evidence to explain the meaning of a written instrument under

California law is not simply whether the contract appears to the court to be plain and

unambiguous on its face, but whether the offered evidence is relevant to prove a meaning

1   to which the language of the instrument is reasonably susceptible.  Pac. Gas & Elec., 69

2   Cal 2d at 37.

3   > A rule that would limit the determination of the meaning of a written
> instrument to its four-corners merely because it seems to the court to be clear

4   > and unambiguous, would either deny the relevance of the intention of the
> parties or presuppose a degree of verbal precision and stability our language

5   > has not attained. . . . Although extrinsic evidence is not admissible to add to,
> detract from, or vary the terms of a written contract, these terms must first be

6   > determined before it can be decided whether or not extrinsic evidence is
> being offered for a prohibited purpose.  The fact that the terms of an

7   > instrument appear clear to a judge does not preclude the possibility that the
> parties chose the language of the instrument to express different terms. . . .

8   > Accordingly, rational interpretation requires at least a preliminary
> consideration of all credible evidence offered to prove the intention of the

9   > parties.

10  Id. at 37-40 (citations and footnotes omitted).

11          The disputed language in this case is the exception, in the arbitration provision, to

12  the requirement that "all disputes or differences arising out of or connected with this

13  contract" be referred to binding arbitration.  The sole exception provides that any party shall

14  have the right to litigate "[i]n the event that any of the issues which form the subject matter

15  of the arbitration involve allegations of misrepresentation, non-disclosure, concealment or

16  fraud."  Under Pacific Gas & Electric, the court must consider whether the language of the

17  arbitration provision is reasonably susceptible to the meaning urged by the defendants –

18  that is, what the parties meant by the agreed-upon terms – and if so, must consider

19  evidence relevant to prove the meaning urged by the defendants.

20          The court finds that the language of the exception in the arbitration provision is

21  reasonably susceptible to the meaning urged by defendants, and so the court must

22  consider the extrinsic evidence.  The evidence shows that the original arbitration provision

23  in the 1992 Contract contained no exception to the requirement that all disputes under the

24  contract be arbitrated, and that in 1993, the lead underwriter devised an exception for any

25  dispute as to "formation or validity" of the contract (but not excepting disputes regarding

26  interpretation or implementation of the terms of the contract).  The evidence shows that the

27  general intent of the lead underwriter was to require arbitration for all disputes unless a

28  dispute involved a question as to whether the contract was actually valid.  CNA, one of the

reinsurers, was not happy with the exception, and wanted an arbitration provision with no exceptions.  CNA finally agreed to sign the 1993 Contract, but only on the condition that the arbitration provision be modified in the 1994 Contract.

The lead underwriter, in conjunction with the intermediary (Carvill), subsequently developed the arbitration provision that appeared in the 1994 contract.  The evidence shows that it was the intent of the lead underwriter to include an exception which would allow the reinsurer to challenge the contract on grounds of misrepresentation, non-disclosure, or non-payment of premium – "matters which make the validity of the contract questionable."  This intention was understood by R.K. Carvill, which communicated it to Carvill America, which in turn communicated it to the reinsurers.  Thus, the lead underwriter, the intermediary, and the reinsurers all had the same intention, and the same understanding as to what the exception meant.  Where the parties to a contract have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.  Rest. 2d, Contracts § 201(1); see also E. Allen Farnsworth, Contracts (1982) § 7.9.

Under the terms of the contracts at issue, Carvill was acting as MIEC's intermediary. Reinsurance intermediaries are brokers, and their role is similar to that of the traditional insurance broker.  Calif. Ins. Law & Practice, § 11.01[2][d].  An insurance broker is one who acts as a middleman between the insured and the insurer.  Krumme v. Mercury Ins. Co., 123 Cal. App. 4th 924, 929 (2004).  "'Insurance broker' means a person who, for compensation and on behalf of another person, "transacts insurance other than life with, but not on behalf of, an insurer."  Cal. Ins. Code § 33.  In short, an insurance broker is the agent of the insured.  Marsh & McLennan of Cal., Inc. v. City of Los Angeles, 62 Cal. App. 3d 108, 117 (1976).  Most cases recognize an agency relationship between the reinsurance intermediary and the cedent (the insurance company that is transferring or "ceding" its risk – the reinsured).  See Barry Ostrager and Mary Kay Vykocil, Modern Reinsurance Law and Practice (2d ed. 2000) § 4.03[b].  Thus, even though Carvill may not have communicated the lead underwriter's intent to MIEC, MIEC is still bound by Carvill's knowledge because

1  Carvill was acting as MIEC's agent during the during the time the contract was being

2  negotiated.

3                                          **CONCLUSION**

4         In accordance with the foregoing, the court finds that a valid agreement to arbitrate

5  exists, and that the agreement encompasses the dispute at issue between MIEC and the

6  reinsurers.  Accordingly, the court hereby GRANTS the motion to compel arbitration and to

7  stay the action.

8         All dates on this court's calendar are VACATED and the stay shall remain in effect

9  until the parties have returned from arbitration.

10

11 **IT IS SO ORDERED.**

12 Dated:  February 24, 2006

13                                        _____
                                         PHYLLIS J. HAMILTON
                                         United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28